**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3660

DEMETRE DEUTH; and
LUIS PLASCENCIA,

      Plaintiffs,

v.

MARTIN MARIETTA, INC.,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs Demetre Deuth and Luis Plascencia, through their counsel, David A. Lane and Tyrone Glover of KILLMER, LANE & NEWMAN, LLP, respectfully allege for their Complaint and Jury Demand:

## I. INTRODUCTION

      1.    Plaintiffs Demetre Deuth, a Black man, and Luis Plascencia, a Latino man, were qualified and competent employees of Martin Marietta, Inc. ("MMI"). They were hard working mechanics, worked long hours, were enthusiastic, and were good at their jobs. Their hard work and enthusiasm were constantly challenged, however, by the overt racism they faced from their white co-workers, specifically, their white facility operator, Jack Klingen.

      2.    Mr. Klingen and others subjected Plaintiffs to shockingly racist remarks and behaviors. Plaintiffs would not tolerate such appalling behavior and they formally complained to their manager Russell Brynjulson, who is white. He did nothing to address their complaints.

3.      In November 2019, after Mr. Klingen punched Plaintiff Deuth in the face,

Plaintiffs again tried to bring this abhorrent behavior to the attention of MMI. Plaintiffs

complained to Mr. Brynjulson about the discrimination against them and the assault of Mr.

Deuth, and this time they also complained to MMI Human Resources and the MMI "Safe to

Tell" hotline. In December 2019, MMI fired Plaintiffs, just *weeks* after their last complaint.

4.      MMI's unlawful termination of Mr. Deuth and Mr. Plascencia's employment

because of their race, and in retaliation for their protected complaints of discrimination, violated

Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"),

and caused Mr. Deuth and Mr. Plascencia to suffer substantial injuries, damages, and losses.

## II.      JURISDICTION AND VENUE

5.      This action is brought under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. §§ 1981. Jurisdiction of this Court is

invoked under 28 U.S.C. § 1331.

6.      Jurisdiction supporting Plaintiffs' claims for attorney's fees and costs is conferred

by 42 U.S.C. §§ 2000e-5(k) and 1988.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or

omissions giving rise to the claim occurred in the District of Colorado.

## III.  ADMINISTRATIVE PREREQUISITES

8.      Plaintiffs timely filed Charges of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") and each have received their right to sue. Thus, all

administrative prerequisites have been met.

## IV.  PARTIES

9.      Plaintiff Demetre Deuth is a resident of, and domiciled in, the State of Colorado. At all times relevant to this Complaint, Mr. Deuth was a current or former employee of Martin Marietta, Inc.

10.     Plaintiff Deuth is a Black man and thus is a member of the class of persons protected by Title VII and Section 1981.

11.     Plaintiff Luis Plascencia is a resident of, and domiciled in, the State of Colorado. At all times relevant to this Complaint, Mr. Plascencia was a current or former employee of Martin Marietta, Inc.

12.     Plaintiff Plascencia is a Latino man and thus is a member of the class of persons protected by Title VII and Sections 1981.

13.     Defendant Martin Marietta, Inc. is a North Carolina corporation with its headquarters in Raleigh, North Carolina. MMI's Colorado Division Office is at 1627 Cole Blvd, Suite 200, Lakewood, Colorado 80401, and the facility relevant to this Complaint, Martin Marietta Riverbend Sand and Gravel, is at 12673 County Road 6, Brighton, Colorado 80603. Martin Marietta has continuously been an "employer" within the meaning of Title VII.

## V.       STATEMENT OF FACTS

14.     MMI, among various other enterprises, is an American-based supplier of building materials— including aggregates, cement, ready mixed concrete and asphalt. MMI owns and operates the Martin Marietta Riverbend Sand and Gravel Facility, at 12673 County Road 6, Brighton, Colorado 80603 (the "MMI Facility" or "Facility").

15.     The MMI Facility mines coarse particulate material for construction projects. Workers at the Facility unearth, process, and sort material during the day. A night crew then maintains the Facility equipment and fixes anything that may have broken. The MMI Facility utilizes sorting screens, loaders, and conveyor belts to complete these tasks.

16.     Plaintiff's both worked at the MMI Facility. Plaintiff Deuth began working for MMI and at the MMI Facility in February 2019. Plaintiff Plascencia began working for MMI and at the MMI Facility around July of 2013. Both were fired on December 16, 2019.

### *Mr. Deuth and Mr. Plascencia were both competent employees for MMI*

17.     Mr. Deuth started his career at MMI in an entry level laborer position. Before working for MMI, he worked at Denver International Airport where he maintained and fixed conveyor belts. His duties at MMI included, but were not limited to, fixing and maintaining conveyor belts. Mr. Deuth also has an auto mechanics degree. As part of obtaining this degree he worked with equipment and systems, specifically conveyor belts, like those found at the MMI Facility. Mr. Deuth works on cars as a hobby and is generally well versed in things mechanical.

18.     Mr. Deuth was hired onto the night crew. His job was to arrive at the MMI Facility a couple of hours before the day shift ended, and then over the next 12-14 hours perform general Facility maintenance by replacing sorting screens, wiping down conveyor belts, and fixing conveyor belt rollers. He would also work to fix anything that had broken during the day such as sorting screens or clogged pipes.

19.     During his 10 months at MMI, Mr. Deuth excelled in his job consistently earning positive performance reviews. He applied for and was promoted to night mechanic after just seven months on the job. This promotion came with a pay raise. He quickly became one of the

more senior and knowledgeable workers on the night crew. Mr. Deuth was generally well-liked, and his co-workers regarded him as upbeat, dependable and hardworking.

20.     Mr. Plascencia, similarly, started his career at MMI in an entry level laborer position. He has a mechanic's degree and before joining MMI, he worked for an automobile parts and accessories company. Mr. Plascencia also works on cars as a hobby and is knowledgeable in things mechanical.

21.     Mr. Plascencia worked at MMI for six years. Like Mr. Deuth he started on the night shift. After two years, he was promoted to lead man for the night shift. Three years later he was promoted to welder, and then after only six months he was promoted to the lead man for the dayshift. Mr. Plascencia essentially ran the day-to-day ground operations of the Facility.

22.     During his six years at MMI, Mr. Plascencia was an outstanding employee consistently earning positive performance reviews. He was an essential member of the MMI team. He knew the Facility inside and out and could troubleshoot nearly all the equipment issues efficiently and with a smile. Mr. Plascencia would most always say yes if the Facility needed help and he would regularly stay late. If something happened causing the Facility to go offline, which cost MMI $11,000 an hour, he could get the Facility back online quickly.

23.     Mr. Plascencia was a leader amongst his co-workers. He was on the MMI safety committee and would consistently run safety meetings at the MMI Facility. He would regularly stay late after his dayshift had ended, and train new nightshift employees. Mr. Plascencia's work was so outstanding that in February 2019, MMI flew Mr. Plascencia to Reno, Nevada to put on a training for new employees. Mr. Plascencia was thrilled to be part of the MMI team and participated enthusiastically in all the workplace activities.

### *The MMI Facility was hostile for Black and Latino workers.*

24.     The Black and Latino workers were treated worse than their white counterparts at the MMI Facility. White workers openly used racist slurs, made racist jokes, and made racist comments about Black and Latino people. There were several incidents of white MMI Facility workers calling Black co-workers niggers over text or in-person. One such incident occurred in a January 15, 2017; a lead man called a Black co-worker a stupid nigger over text message. Plaintiff Plascencia was on the text message chain. Another in 2018, a night lead man called a Black co-worker a nigger while at work.

25.     White MMI workers used physical violence against Black and Latino workers. In October 2019, when Plaintiff Plascencia respectfully told his lead he could not stay late and work extra hours because he had plans, his lead picked up a chair and threatened to throw or hit Mr. Plascencia with it. In another incident in November 2019, the MMI Facility operator, Jack Klingen, punched Plaintiff Deuth in the face because he perceived that Mr. Deuth was laughing at him.

26.     Black and Latino workers were also made to work more than their white counterparts. Plaintiffs were often asked to work late after their shifts and white workers, such as Mr. Klingen, would go home. White workers, such as Mr. Klingen could also get away with not performing their duties. For example, Mr. Klingren, would often operate the Facility at such a high output it would shut down and be taken offline. Rather than repair the Facility, Mr. Klingren would leave after his shift concluded, leaving Plaintiff's and other Black and Latino co-workers to fix the mess he created. Often this would mean these workers would be called in on their days off.

27.     Black and Latino workers were also given more grueling tasks than their white counterparts. The plant operator, Mr. Klingen and plant manager Russel Brynjulson would regularly assign Black and Latino workers to the most harsh and labor-intensive tasks. Specifically, in 2017, Mr. Brynjulson and Mr. Klingen assigned an older Mexican worker to run in a cold *mud shack* where he was tasked with picking the freezing mud off rocks before they were sent down the conveyor belt for processing. Despite complaints from this worker and other workers as to how he was being treated, Mr. Brynjulson and Mr. Klingen continued to assign him this task repeatedly.

28.     Black and Latino workers were also fired and transferred more frequently than their white counterparts. For instance, in 2017, a Latino man accidently backed his truck into a structure on the jobsite, causing minor damage, and was immediately fired. In 2016, the former plant operator, a Black man who had been with MMI for 25 years, was transferred to another facility after getting into an argument with another co-worker. The current white plant operator, Mr. Klingen, punched Plaintiff Deuth in the face. He apparently received no discipline for this act of workplace violence and is still working at the MMI Facility.

29.     Black and Latino workers also had a more difficult time advancing at the MMI Facility. In 2016, Mr. Plascencia was *promoted* to the title and responsibilities of lead man on the night shift, but he was not given a pay raise. In 2017, he wrote a letter to MMI human resources, where he complained of this discrepancy and asked human resources to remedy it. Human resources did not address Mr. Plascencia's complaint, and Mr. Plascencia did not receive his pay raise until he was promoted to the day shift.

***<u>The MMI Facility operator made racially offensive comments to and around Plaintiffs.</u>***

30.     The MMI Facility operator Jack Klingen regularly made racist and xenophobic remarks to, and around, Mr. Deuth and Mr. Plascencia.

31.     In July 2019, at a safety meeting, which included several MMI higher-ups, Mr. Klingen told the office manager, who is a Mexican woman, that New Jersey is up here, *he gestured up high with his hand*, and Mexico is down here, *he gestured down low with his hand,* and then he gave her the middle finger.

32.     Mr. Klingen would regularly talk about kicking all the "*illegals*" out of the United States. He said that the "illegals" were taking American jobs, should not be here, that America should build a wall to keep the "illegals" out, and that "illegals" don't pay taxes. Mr. Klingen would also yell at his co-workers to speak only English over the common radio channel when they were speaking Spanish.

33.     Mr. Klingen, likewise, used the racial slur "nigger", when referring to Black people and Black co-workers. He said nigger to and around his Black co-workers including Mr. Deuth and Mr. Plascencia. He referred to Mr. Deuth as a nigger.

34.     Mr. Klingen would also regularly expose his genitals and anus to Plaintiffs and other co-workers. Indeed, Plaintiffs possess a photograph of Klingen exposing his genitals on the job site.

35.     In October 2019, several MMI Facility workers, including Mr. Deuth and Mr. Plascencia, went to the Facility manager, Mr. Brynjulson, to complain about Mr. Klingen. In a roughly 40-minute meeting these employees voiced their concerns over Mr. Klingen's racism and inappropriate behavior. The employees asked that Mr. Brynjulson get MMI human resources

involved. They were told by Mr. Brynjulson he would address their concerns. Upon information and belief, Mr. Brynjulson did not report this information to human resources, but instead told Mr. Klingen what his co-workers had said about him. Shortly after the meeting between Mr. Brynjulson and the workers, Mr. Klingen approached several workers who were at the meeting, including Plaintiffs, and told them if they had a problem, they needed to come directly to him so they could handle it *man-to-man*.

### *The MMI Facility operator punched Mr. Deuth in the face.*

36.     In mid-November 2019, Plaintiffs were working at the MMI Facility when Mr. Plascencia noticed that some machinery was clogged with mud and other materials. This rendered the Facility inoperable and the entire Facility had to be taken offline so it could be fixed. Mr. Plascencia and others began fixing the clog. Fixing a clog of this magnitude can take hours and sometimes days.

37.     As Mr. Plascencia was fixing the clog, Mr. Deuth walked up. He recognized that the machinery was clogged and jested with another co-worker about overtime pay due to the extra work that needed to be performed to unclog it. The two were talking directly to each other, smiling and laughing.

38.     Jack Klingen suddenly walked up. His jaw was tight, and fists clinched. He said something to the effect of, "*it's my fault huh!*" Then without provocation, he punched Mr. Deuth in the face—knocking Mr. Deuth's helmet and eyeglasses off. Mr. Deuth, shocked, picked up his eyeglasses, which were bent and scratched, and walked away from Mr. Klingen. Mr. Klingen followed Mr. Deuth, apologizing and saying to Mr. Deuth it was an accident. Mr. Klingen said that Mr. Deuth could punch him in the face so that the two would be even. Mr. Deuth declined.

39.     Mr. Deuth sat in his work truck.  Mr. Plascencia walked after him to make sure he was okay, joining him in the front passenger seat. Mr. Deuth was visibly shaken, his eyes were welling up and he was trembling from what had happened. He had just been assaulted by the Facility operator in front of his friends and co-workers—he could not go back to the job site.

### ***Plaintiffs felt they had no choice but to report their colleague's discrimination and assault to the MMI Facility manager Russel Brynjulson.***

40.     Mr. Deuth and Mr. Plascencia called the MMI Facility manager Russel Brynjulson to report the assault.  They told Mr. Brynjulson what had happened, and Mr. Deuth said that he did not feel comfortable going back to work. As Mr. Deuth spoke, he was teary-eyed, and his voice cracked. Mr. Brynjulson responded that he did not need this right now and that he could not afford to lose his plant operator [Mr. Klingen]. Mr. Brynjulson was more upset at the possibility that Mr. Klingen would be fired than about Mr. Deuth getting punched in the face. Mr. Brynjulson's tone was in fact accusatory towards Mr. Deuth.

41.     Nonetheless, Mr. Brynjulson sent Mr. Klingen home from work pending an investigation into the incident. Mr. Brynjulson gathered written and oral statements from several of the MMI Facility workers, most of which were Black or Latino. Their statements corroborated that Mr. Deuth was punched in the face by Mr. Klingen. While Mr. Klingen was home from work, he text messaged MMI Facility workers telling them that his assault against Mr. Deuth was an accident. He urged them to tell management this was an accident. He called Mr. Plascencia and urged him to "have his back" or he will get fired. He texted the same to Mr. Deuth and in addition offered him $400 not pursue the matter.

10

42.     When Mr. Deuth returned to work the next day, Mr. Brynjulson did not ask him how he was doing and avoided Mr. Deuth. A week later Mr. Deuth was instructed to go to the MMI human resources office in Lakewood Colorado, roughly a 30-minute drive from the MMI Facility. There, Mr. Deuth was interviewed about the incident by the human resources manager Lashanda Rigsby, who is white. Mr. Deuth recounted what happened. He showed Ms. Rigsby the text messages where Mr. Klingen offered him $400 to just drop it. He told her about the racist and xenophobic comments pertaining to Black and Latino people. He told her that obviously, he could not work in this environment.

43.     The following day when Mr. Deuth returned to the MMI Facility, Mr. Brynjulson informed him that Mr. Klingen would be returning to work shortly and that the two needed to stay away from each other and act like adults. Mr. Deuth told Mr. Brynjulson he was afraid Mr. Klingen would retaliate against him. Mr. Brynjulson declined to address Mr. Deuth's concern.

44.     When Mr. Klingen returned, he went out of his way to not talk to or make eye contact with Mr. Deuth, Mr. Plascencia or the co-workers who had given statements about the incident. He began never referring to Mr. Deuth by name and would regularly disparage his work product over the common radio channel so that the manager Mr. Brynjulson would hear.

45.     Frustrated with the lack of response from the MMI Facility manager and MMI human resources, Mr. Deuth, Mr. Plascencia, and several other MMI employees called the MMI employee "Safe to Tell" hotline to formally complain to MMI Corporate about the assault of Mr. Deuth by Mr. Klingen and how it was handled. They complained that Mr. Klingen was being given unfair leniency for punching his co-worker in the face largely because Mr. Klingen was white, and Mr. Deuth was Black. They complained that it was unreasonable to ask Mr. Deuth to

come back to work with someone who weeks earlier punched him in the face. A week after making their complaints via the MMI hotline, the MMI Facility employees were contacted and informed that MMI Corporate had spoken to MMI human resources, and MMI would be taking no further action.

### *MMI Fired Plaintiffs based on their race and in retaliation for their complaint of discrimination.*

46.     Less than a month after Mr. Deuth and Mr. Plascencia reported the assault of Mr. Deuth, and just weeks after contacting the MMI hotline, MMI terminated Mr. Deuth and Mr. Plascencia over a minor infraction. The MMI Facility had just received a new body hoist. Mr. Deuth, Mr. Plascencia, and two other employees were testing the hoist at the end of their shift. One employee filmed them testing the hoist on a smartphone camera and posted it to social media. Russel Brynjulson was forwarded the social media post, and Mr. Deuth, Mr. Plascencia, and two other MMI employees, both Latinos, were told they needed to meet with Lashanda Rigsby in human resources.

47.     Initially, it appeared as though Ms. Rigsby would impose consequences short of termination. That was until Mr. Plascencia respectfully voiced his disappointment with how they were being treated for something so minor, when Mr. Klingen punched Mr. Deuth in the face and kept his job. He further pointed out the double standard that existed at MMI, and specifically the MMI Facility, where the white workers were given preferential treatment and leeway over the Black and Latino workers. When presented with these concerns Ms. Rigsby became angry. She yelled and cursed and fired Mr. Plascencia and then fired the other three workers, including Mr. Deuth.

48.     Mr. Klingen continues to work at the MMI Facility.

## FIRST CLAIM FOR RELIEF
### Race Discrimination in Violation of 42 U.S.C. § 1981

49.     Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

50.     Plaintiffs are Black and Latino, and thus members of a protected class under 42 U.S.C § 1981.

51.     Plaintiffs were, and have at all relevant times been, qualified to perform their job responsibilities as MMI employees, and performed their jobs satisfactorily at all relevant times.

52.     Plaintiffs' employment relationship with MMI encompassed sufficient contractual rights to support a section 1981 claim for race discrimination.

53.     Defendant denied Plaintiffs the protections against race discrimination provided by 42 U.S.C § 1981 in the terms and conditions of their employment by denying them the same benefits, privileges, and terms and conditions of their contractual employment relationship that their white counterparts enjoyed by, including but not limited to, terminating their employment, not disciplining their plant operator for racist, xenophobic, and assaultive behaviors, creating inequitable work conditions across racial lines, not considering the grievances of Plaintiffs and other Black and Latino workers, and taking other adverse employment actions against Plaintiffs because of their race where such actions were not taken against similarly situated white MMI employees.

54.     Additionally, or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race where such conditions were not present for similarly situated white MMI employees.

55.     The harassment based on race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

56.     Plaintiffs' race was a but-for cause of Defendant's adverse actions and harassment against Plaintiffs.

57.     Defendant engaged in race discrimination against Plaintiffs pursuant to its custom, policy, or practice to treat more favorably white MMI employees versus Black and Latino MMI employees.

58.     Defendant was on notice of MMI's defective customs, policies, and practices well before its discriminatory treatment and harassment against Plaintiffs, and it deliberately failed to remedy the serious deficiencies of which it was aware.

59.     As a direct and proximate result of Defendant's discriminatory treatment, Plaintiffs have suffered significant injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of 42 U.S.C. § 1981

60.     Plaintiffs incorporate all allegations in this Complaint as though fully set forth herein.

61.     Plaintiffs believed in good faith that Defendant discriminated against them on the basis of their race.

62.     Plaintiffs engaged in activities and speech opposing discrimination by objecting to and reporting discrimination and retaliation to the MMI Facility Manager, MMI Human Resources, and the MMI *Safe to Tell* hotline.

63.     Because of Plaintiffs' objections to discrimination, Defendant subjected them to actions which a reasonable employee would have found materially adverse, including but not limited to requiring them to work in a hostile work environment which materially and adversely affected the terms and conditions of their employment, subjecting them to adverse treatment and harassment to which their similarly situated counterparts were not subject, and terminating their employment, among other materially adverse actions.

64.     Defendant engaged in unlawful retaliation against Plaintiffs pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

65.     Defendant's retaliation against Plaintiffs arose out of, was caused by, and was like and related to the race discrimination Plaintiffs opposed.

66.     Defendant's retaliation against Plaintiffs was the direct and proximate cause of Plaintiffs' significant injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964, As Amended, 42 U.S.C. § 2000e, *Et Seq.* Discrimination Based on Race

67.     Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

68.     As Black and Latino persons, Plaintiffs are members of a protected class under Title VII.

69.     At all relevant times, Plaintiffs performed the functions of their job satisfactorily and were qualified for their positions.

70.     Defendant subjected Plaintiffs to adverse treatment in the terms and conditions of their employment because of their race.

71.     Defendant treated Plaintiffs less favorably than their similarly situated white counterparts terminating their employment, not disciplining their plant operator for racist, xenophobic, and assaultive behaviors, creating inequitable work conditions across racial lines, not considering the grievances of Black and Latino workers because of their race, where such actions were not taken against similarly situated white MMI employees.

72.     Additionally, or alternatively, Defendant created abusive working conditions for Plaintiffs due to harassment based on their race where such conditions were not present for similarly situated white MMI employees.

73.     The harassment based on race to which Defendant subjected Plaintiffs was pervasive and/or severe enough to alter the terms, conditions, or privileges of their employment and create a hostile or abusive work environment.

74.     Defendant intended to discriminate against Plaintiffs because of their race in taking adverse employment actions against them.

75.     Defendant permitted, tolerated, and ratified remarks made by Plaintiffs' colleagues and supervisors that reflected a discriminatory animus.

76.     Plaintiffs' race was a motivating factor in Defendant's taking adverse employment actions against Plaintiffs, and Defendant took such actions because of Plaintiffs' race.

77.     Defendant's asserted reasons for taking adverse employment actions against Plaintiffs were mere pretext for illegal discrimination and did not actually motivate such actions.

78.     Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly or by and through its agents, discriminated against Plaintiffs on the basis of their race, and directly and proximately caused their injuries, damages, and losses.

## FOURTH CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*
### Retaliation

79.     Plaintiffs incorporate all the paragraphs of this Complaint as though fully set forth herein.

80.     At all relevant times, Plaintiffs were qualified to perform their job responsibilities and satisfactorily performed the duties of their positions.

81.     Plaintiffs believed in good faith that Defendant discriminated against them on the basis of their race.

82.     Plaintiffs opposed activities prohibited by Title VII by objecting to and reporting discrimination and retaliation against them and other MMI employees to the MMI Facility Manager, MMI Human Resources, and the MMI *Safe to Tell* hotline.

83.     As a direct result of Plaintiffs' opposition to activities prohibited by Title VII, Defendant subjected them to actions which a reasonable employee would have found materially adverse, including but not limited to requiring them to work in a hostile work environment which materially and adversely affected the terms and conditions of their employment, subjecting them to heightened scrutiny, subjecting them to adverse treatment and harassment to which their similarly situated counterparts were not subject, and terminating their employment.

84.     Defendant's retaliation against Plaintiffs arose out of, was caused by, and was like and related to the discrimination Plaintiffs opposed.

85.     Defendant treated Plaintiffs more adversely than their similarly situated counterparts who did not voice their opposition to Defendant's discrimination.

86.     Defendant's asserted reasons for taking adverse actions against Plaintiffs were pretext for illegal retaliation and did not actually motivate Defendant's actions.

87.     Defendant is liable for the acts and omissions of its agents and employees.

88.     Defendant, either directly or by and through its agents unlawfully retaliated against Plaintiffs, which directly and proximately caused them severe injuries, damages, and losses.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law, including, but not limited to:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.   Pre-judgment and post-judgment interest at the highest lawful rate;

e.   Attorney's fees and costs; and

f.   Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 14th day of December 2020.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*

David A. Lane
Tyrone Glover
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001 – facsimile
dlane@kln-law.com
tglover@kln-law.com

*Attorneys for Plaintiffs*